Robert SELLS
and Clarana Sells
*v.*
DEPARTMENT OF REVENUE
(TC 3600)

Donna C. Kreitzberg, Portland, represented plaintiffs.

Rochelle Nedeau, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered November 7, 1994.

**CARL N. BYERS, Judge.**

Plaintiffs appeal the assessed value of their real property for the 1992-93 tax year. The primary dispute is how water runoff affects the value of the property. Plaintiffs contend that water runoff damages the residence and makes the undeveloped land too expensive to develop.

## FACTS

The subject property consists of 4.5 acres and plaintiffs' personal residence. It is located in Southwest Portland between 57th Place and 62nd Drive and is accessible from both streets. The land is a rectangular shape except the southwest corner curves with 62nd Drive. The property

slopes from north to south with a ravine running through its center. The ravine also causes the land to slope toward the middle. Plaintiffs' home was architecturally designed and constructed in 1958. It has a main floor and a daylight basement, each containing 1,468 square feet. The main floor is comprised of the living room, dining room, kitchen, three bedrooms and one and one-half baths. The basement, which is only 50 percent finished, contains three bedrooms and one and one-half baths. The property also includes a two-car garage, in-ground swimming pool, pool house and utility building.

Plaintiffs have lived on the property for the past 36 years. They experienced no water problems until 1979 when the September Hills Subdivision was developed on an adjacent parcel to the north. Since that development, water runoff has damaged the subject improvements and land. Plaintiffs sued both the city and the developer for damages, but were unsuccessful. *Sells v. Nickerson*, 76 Or App 686, 711 P2d 171 (1985). Photographs taken in 1982 show severe surface runoff with plaintiffs' backyard flooded and significant erosion problems. Plaintiffs have taken various steps to control or minimize the damage, including installing a French drain at a cost of approximately $30,000.[1] The French drain did not solve the problem. A photograph taken in 1993 shows runoff similar to that experienced in 1982.

Plaintiffs claim the primary damage to the improvements is to the concrete. Plaintiffs' expert witness, an experienced concrete contractor, testified that the cracking and sinking of the concrete is evidence of ground movement. Because it appears the house was not built on fill, the witness attributed the movement to water. This witness pointed out structural cracks and construction or joint cracks. The garage floor has a structural crack and the tilt in the floor is evident. The walkway behind the garage has sunk four inches in one area. The foundation of the house has a serious structural crack affecting the basement wall, floor and ceiling. The witness testified he replaced the front steps in 1992 and they cracked again within one year. He estimated the

---

[1] A French drain is described as a ditch filled with rocks or gravel and then covered over. The purpose of the drain is to intercept water runoff and drain it away from a particular area.

cost to repair or replace all of the cracked concrete would be $36,150. However, if subsurface water is causing the earth to move, repairs or replacement would not stop the cracking. Although the cost of replacement is not justified as long as the property can be used, it does affect market value.

The ravine area is designated a "significant water feature" which must be kept in its natural state. Plaintiffs are concerned that development of the subject land would affect the downhill properties which receive the runoff. A city engineer testified there is an unofficial storm drain on a neighboring property which receives most of the runoff from the ravine.

## ISSUES

The issues before the court are:

(1) The effect of the water problems on the real market value of the improvements; and

(2) Whether the highest and best use of the land is for development.

## EFFECT OF WATER DAMAGE

Appraisers for both parties used the sales comparison method in arriving at their estimates of value for the improvements. Plaintiffs' appraiser adjusted his comparable sales $30,000 for the condition of the improvements and $15,000 for location, a total of $45,000 for the water problem. Defendant's appraiser adjusted one sale $5,000 and the other sales $10,000. He indicated these were not estimates of cost to cure but simply estimates of the negative impact on market value of the cracks in the concrete. He believed the water problem had been solved.

Neither appraiser had data to support his position. Neither position is persuasive because the court rejects the assumptions of each appraiser. Plaintiffs' appraiser assumed that the water problem could not be fixed without adverse effects on the properties downhill, making plaintiffs liable for damages. The evidence indicates that the water problem can be remedied. Both plaintiffs' witness, Mr. Moore, and defendant's witness, Mr. Beckler, indicated that the water problem could be solved and the land could be developed. Defendant's

appraiser assumed that the water problem had been cured. The court finds that as of the date in question, the water problem had not been cured, either for the improvements or for development of the land.

## HIGHEST AND BEST USE

■ Whether the subject land has a highest and best use for development depends upon whether development is physically possible and financially feasible.[2] Plaintiffs' appraiser testified that homesites in the area typically run from $25,000 to $30,000 per lot. He estimated that the subject property would have a real market value of $10,000 per acre. This appraiser provided no data to support his estimates, which seem unreasonably low in view of the number of lots that can be developed on one acre. Also, plaintiffs' appraiser did not estimate the cost per lot to cure the water problem. Implicit in this appraiser's work is the assumption that the highest and best use of this property is not for development.

Defendant's appraiser believes the highest and best use of the land is residential development. He used three comparable sales to derive an indication of value for land subject to development. However, the court is not persuaded the highest and best use is residential development.

Although defendant's expert witness, Mr. Beckler, believes it is possible to develop the subject property, his opinion was limited in scope to water management. He offered no cost estimates for water management or other development costs. Clearly the topography would make the sewer lines longer and more expensive. Plaintiffs' geotechnical engineer testified that the land is rocky and would require blasting, making development more expensive. This opinion was supported by plaintiffs' testimony that the September Hills Subdivision required blasting for its development.

The court is also not persuaded that defendant's comparable sales are comparable. Comparable sale No. 2

---

[2] The definition of highest and best use is: "[T]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." Appraisal Institute, *The Appraisal of Real Estate*, 275 (10th ed 1992). Physically possible and financially feasible are the primary elements in the analysis of the subject property.

had timber on it, which may have affected its sale price. None of the comparables had a significant water feature. Defendant offered no information as to whether there was rock present on the comparable sales requiring blasting, or whether the comparable sales were subject to water runoff problems similar to the subject. In short, defendant did not submit enough information to enable the court to determine whether the sale properties are comparable to the subject.

■　　　Without an estimate of development costs, the court can only speculate whether development is financially feasible. As Mr. Beckler testified, many development proposals "die along the way" because investigation and study make it apparent they are not physically possible or financially feasible.

On the other hand, the subject land appears to have value attributable to its potential for development. Until it is determined that the land cannot be developed, its real market value will reflect the possibility of development. As of the assessment date in question there was no information or action that would eliminate market expectations of development. The city planners held out the possibility the land could be developed. Neither party had estimates of development costs to indicate whether development is or is not financially feasible. Plaintiffs have never listed the property or exposed it to the marketplace. With this state of facts, the market would attribute some value to the property for the possibility of development. That increment of value will either increase, as the probability of development grows more certain, or disappear, once it is ascertained that development is not financially feasible.

Reviewing the evidence in this case is like watching a 12-round heavyweight boxing match that ends in a draw. After enormous efforts by both parties, the court finds that neither party can prevail on the evidence adduced at trial. Plaintiffs have the burden of proving a lesser-assessed value. Plaintiffs failed to carry that burden. Defendant sought an assessed value in excess of that now on the roll. Defendant failed to prove a higher value. Accordingly, the court must sustain department's Opinion and Order No. 93-1696 setting the value at $95,200 to the land and $91,800 to the improvements for a total of $187,000. Costs to neither party.